## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

POPSOCKETS, LLC., a limited liability company,

      Plaintiff,

   v.

OEM ACCESSORIES INCORPORATED, a New Jersey Corporation; YOSEF MENDLOVITZ, an individual; and DOES 1 through 10, whose true names are unknown.

      Defendants.

## COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), AND RELATED CLAIMS

Plaintiff PopSockets, LLC, a limited liability company ("Plaintiff" or "PopSockets"), brings this action against Defendant OEM ACCESSORIES INCORPORATED, a New Jersey corporation, YOSEF MENDLOVITZ, an individual, and Does 1-10 (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125; and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a). These claims arise from Defendants' misappropriation of PopSockets' trademarks by selling used, dirty, poor-quality, potentially counterfeit, and otherwise non-genuine products bearing PopSockets trademarks on the Internet despite advertising these products as new and genuine PopSockets products. In support of its Complaint, PopSockets alleges as follows:

**PARTIES**

1.      PopSockets is a limited liability company, organized under the laws of the state of Colorado, with its principal place of business located in Boulder, Colorado.

2.      Defendant OEM Accessories Incorporated is a New Jersey corporation, organized under the laws of New Jersey and registered as a foreign corporation in New York, with its principal place of business located in 31 Industrial Avenue, Mahwah, New Jersey, 07430, and doing business as "Alwayz-On-Sale."  According to records of the New Jersey Secretary of State, OEM Accessories Incorporated's principal address, mailing address, and registered agent address is 31 Industrial Avenue, Mahwah, New Jersey, 07430/

3.      Defendant Yosef Mendlovitz is a natural person who, upon information and belief, is the owner, operator, and registered agent of Defendant OEM Accessories Incorporated.  On information and belief, Defendant Yosef Mendlovitz resides at 1 South Lorna Lane, Monsey, New York, 10952.

4.      Defendant operates a third-party storefront on www.amazon.com ("Amazon") that is currently called "Alwayz-On-Sale," with a Merchant ID number of A3PUKTJIAB9Y0H. "The Alwayz-On-Sale"         storefront         can         be         accessed         at: https://www.amazon.com/s?me=A3PUKTJIAB9Y0H&marketplaceID=ATVPDKIKX0DER.

5.      Defendants are acting in concert as part of a coordinated scheme to sell products bearing PopSockets' trademarks without authorization through the "Alwayz-On-Sale" Amazon storefront (the "Unauthorized Storefront").

6.      The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise, of Defendants Does 1 through 10 ("Doe Defendants") are unknown to PopSockets.  Therefore, PopSockets sues these Defendants by a fictitious name.  PopSockets is informed and believes, and on that basis alleges, that the Doe Defendants include persons and entities assisting or acting in connection with the actions complained of herein and include persons and entities that are responsible in some manner for the acts, occurrences, and liability hereinafter alleged   and   referenced.    The   Doe   Defendants   are   unknown   natural   persons   and/or

corporations/business entities that unlawfully acquired, distributed, or sold products bearing PopSockets' trademarks. When the true names, involvement, and capacities of these parties are ascertained, PopSockets will seek leave to amend this Complaint accordingly.

## JURISDICTION

7.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. Plaintiff's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and its claims arising under the laws of the State of Colorado are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

8.    This Court has personal jurisdiction over Defendants because they do business in Colorado and Plaintiff is headquartered in Colorado.

9.    Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the impendency of this action.

## VENUE

10.    Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims herein occurred within this judicial district and Plaintiff resides in this district.

## FACTUAL ALLEGATIONS

### PopSockets and Its Trademarks

11.    PopSockets markets and sells high-quality cell phone accessories including products under the PopSockets® brand name ("PopSockets products").

12.    PopSockets allows its products to be purchased by end-user consumers in the United States only from PopSockets itself or from sellers who are expressly authorized by PopSockets to sell PopSockets products ("Authorized Sellers").

13.    PopSockets permits Authorized Sellers to sell PopSockets products in approved channels only and requires Authorized Sellers to abide by agreements, policies, and other rules

that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "PopSockets Rules").

14.     PopSockets devotes a significant amount of time, energy, and resources toward protecting the value of its brand, products, name, and reputation.  By allowing end-user consumers to purchase PopSockets products only from PopSockets itself or from Authorized Sellers who are required to follow the quality controls and other requirements in the PopSockets Rules, PopSockets ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of the PopSockets brand.  In the highly competitive footwear market, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

15.     To promote and protect the PopSockets brand, PopSockets has registered numerous trademarks with the United States Patent and Trademark Office, including but not limited to: Registration Nos. 5394408, 5204637, 5394408, 5486563, 5662835, and 5757735.

16.     The registration for each of the PopSockets Trademarks is valid, subsisting, and in full force and effect.

17.     PopSockets actively uses, advertises, and markets the PopSockets Trademarks in commerce.

18.     Consumers recognize the PopSockets Trademarks as being associated with high-quality cell phone accessories.

19.     Due to the quality and exclusive distribution of PopSockets' products, and because PopSockets is recognized as the source of high-quality products, the PopSockets Trademarks have enormous value.

**Online Marketplaces and the Challenge They Present to PopSockets Product Quality**

20.     E-commerce retail sales have exploded over the past decade.  From 2013 to the end of 2023, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 5.6% to 15.6%.  *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (November 17, 2023),

4

https://fred.stlouisfed.org/series/ECOMPCTSA.

21.    In 2022, consumers spent $1.03 trillion on e-commerce sales, a 7.7% increase from 2021. *See* Paul Conley, *US ecommerce sales and market size*, DIGITAL COMMERCE 360 (February 17, 2023), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.    The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2022, United States consumers spent $869.8 billion on U.S. marketplaces, including $367 billion on Amazon. *See* James Risley, *What are the top online marketplaces?*, DIGITAL COMMERCE 360 (March 1, 2023), https://www.digitalcommerce360.com/article/infographic-top-online-marketplaces/.

22.    While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

23.    Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.    Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

24.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.    As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

25.    Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.    It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels. *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the*

5

*"gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990. It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces. *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

26.    Third-party sellers on Amazon may also sell counterfeit items, or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

27.    For example, the Department of Homeland Security recently published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods." Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7. The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller." *Id.* at 14-15, 38. To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers." *Id.* at 35.

28.    The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine. *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-

fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea market of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

29.     The problem of sales of counterfeit and poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

30.     In its 2022 annual report to its shareholders, Amazon also admitted that third-party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See Amazon.com, Inc., Annual Report (Form 10-K)*, at 8 (Feb. 2, 2023), *available at* https://ir.aboutamazon.com/annual-reports-proxies-and-shareholder-letters/default.aspx.  Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

31.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability to exercise control over the quality of its products presents serious risks to the safety of consumers.

32.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

33.     When purchasing products on an online marketplace, customers are not informed whether a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.

34.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

35.     When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor-quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

36.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

37.     Online product reviews significantly impact a brand's reputation.  Survey results show that 99.75% of United States consumers read reviews "at least sometimes" when they consider buying a new product online, and 45% will not purchase a product if there are no reviews available for it.  *Survey: The Ever-Growing Power of Reviews (2023 Edition)*, POWER REVIEWS, https://www.powerreviews.com/research/power-of-reviews-2023/ (last visited Jan. 18, 2024).

38.     Reviews are especially impactful on online consumers.  In a brick-and-mortar store, a consumer can simply select another product from the shelf if the initial product selected appears to be compromised.  However, online consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality.  Therefore, online consumers rely more

on brand reputation and reviews.

39.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  One study found that the impact of negative reviews went beyond the impact on a consumer's immediate purchase, but also shortened the time they spent reading other reviews about the product and made them seek more information about competitors.  Paulo Albuquerque and Marton Varga, *How Negative Reviews Affect Online Consumers*, KNOWLEDGE, November 9, 2023, https://knowledge.insead.edu/marketing/how-negative-reviews-affect-online-consumers#:~:text=In%20summary%2C%20a%20negative%20review,seek%20more%20information%20about%20competitors . Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

**PopSockets Has Been the Target of Negative Online Marketplace Reviews from Customers Who Purchased Products from Unauthorized Sellers**

40.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on the product listing.  These negative reviews injure consumer perceptions of the brand's quality and reputation, as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

41.     PopSockets has been a victim of the issues caused by unauthorized sellers on online marketplaces.  Numerous consumers who purchased PopSockets products from unauthorized sellers, like Defendants, have written negative reviews where they complained of receiving products that were damaged, defective, previously used, counterfeit, or of otherwise poor quality.

42.     These complaints include, but are not limited to, the following:  "Pop socket was used, it was damaged, and it wasn't sticky so I couldn't even use it if I wanted to." Amazon

Customer, Dec. 21, 2023. "Received my pop socket today and it's not sticky and appears to be used. No protective film was on it when I unboxed it. It will not stick to my case, no glue on the bottom of it." Merlin, May 10, 2023. "This second time around this was clearly a returned package but was poorly taped back together with a new barcode taped to the back. Packaging was still open and the glue in the back of the popsocket had clearly already been on someone else's phone." Hamm, September 3, 2023. "I was sent a used pop socket. It did not come in its original packaging, had dog hair on it and reeked of cigarettes." Emma, Feb. 13, 2024.

43.    The foregoing reviews are only a small sample of the negative reviews of PopSockets products that have been posted on the Amazon platform.

44.    Amazon does not allow product reviews to identify the seller that sold the product that is the subject of the product review.  Given that Defendants are selling a high volume of products bearing the PopSockets Trademarks on Amazon and are not subject to PopSockets' quality controls, however, it is likely that some of the foregoing negative reviews—and the many similar reviews of PopSockets products that appear on the Amazon website—were written by customers who purchased products bearing the PopSockets Trademarks from Defendants.

**PopSockets Has Implemented Quality Controls throughout Its Authorized Channels of Distribution to Combat the Problems Presented by Online Marketplaces, Protect the Value of the PopSockets Trademarks, and Ensure Customers Receive the Genuine, High-Quality Products They Expect from PopSockets**

45.    The above reviews show how sales of poor-quality PopSockets products disappoint PopSockets' consumers and cause significant harm to the reputation and goodwill of PopSockets and its brand.  To protect itself and consumers from these harms, PopSockets implemented a quality control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

46.    PopSockets' distribution controls are a quality control measure intended to minimize the risk and reputational damage caused by the illegal sale of poor-quality products bearing the PopSockets Trademarks by unauthorized sellers like Defendants who do not abide by PopSockets' quality controls.  The goal of PopSockets' quality control program is to ensure that

consumers who buy PopSockets products, including ones buying online, receive the high-quality products and services that they expect with the PopSockets name. By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the PopSockets brand.

47.     PopSockets abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

48.     PopSockets' ability to exercise its quality controls is essential to the integrity and quality of PopSockets products, as well as the value of the PopSockets Trademarks and other intellectual property.

49.     PopSockets' quality controls begin with requiring that all outside sales of its products take place through PopSockets' own website or through Authorized Sellers. This basic step ensures that everyone who is selling PopSockets products is ultimately subject to PopSockets' quality control requirements.

50.     The PopSockets Rules limit to whom and where Authorized Sellers may sell PopSockets products. To prevent persons outside of PopSockets' quality controls from acquiring and reselling PopSockets products, the PopSockets Rules prohibit Authorized Sellers from selling PopSockets products to any third party who is not an Authorized Seller and who intends to resell the products. Authorized Sellers are permitted to sell PopSockets products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

51.     Authorized Sellers are also prohibited from selling PopSockets products online unless they first obtain written consent from PopSockets.

52.     These restrictions are essential to PopSockets' ability to exercise its quality controls over PopSockets products because they prevent unauthorized sellers from obtaining and reselling PopSockets Products and allow PopSockets to know where all of its products are being sold online by Authorized Sellers. If a quality issue arises through an online sale, PopSockets can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately. PopSockets is unable to take such action against unauthorized sellers because it does

not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

53.    In addition to restricting where and how Authorized Sellers can sell PopSockets Products, the PopSockets Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of PopSockets products.

54.    To ensure that customers receive the genuine and high-quality products they expect from PopSockets, the PopSockets Rules require Authorized Sellers to inspect all PopSockets products for any damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory.  Authorized Sellers are prohibited from selling damaged or defective products.  Further, to assist PopSockets in identifying any product quality issues, Authorized Sellers are required to report any defects to PopSockets.

55.    The PopSockets Rules also require that Authorized Sellers store PopSockets products in accordance with guidelines issued by PopSockets.  This requirement helps ensure that PopSockets products are stored properly and are not damaged prior to being shipped to the consumer.

56.    To avoid consumer confusion and ensure that customers receive genuine PopSockets products, Authorized Sellers must sell PopSockets products in their original packaging and are prohibited from relabeling, repackaging, or altering PopSockets products or any accompanying label, literature, or safety-related information, unless instructed by PopSockets.

57.    Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on PopSockets products, including any serial number, UPC code, or other identifying information.

58.    The PopSockets Rules give PopSockets the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to PopSockets Products, to ensure their compliance with PopSockets' quality control requirements.  Authorized Sellers also must cooperate with PopSockets with respect to any product recall or other consumer safety information dissemination effort conducted by PopSockets regarding PopSockets products.

59.    The PopSockets Rules also require Authorized Sellers to provide various customer services to their customers.

60.    For example, Authorized Sellers must familiarize themselves with the features of all PopSockets products kept in their inventory so that they can advise customers on the selection and safe use of PopSockets products.  Following the sale of genuine PopSockets products, Authorized Sellers must provide ongoing support to consumers and prompt replies to their inquiries.

61.    PopSockets' quality control and customer service requirements are legitimate and substantial and have been implemented so that PopSockets can control the quality of goods manufactured and sold under the PopSockets Trademarks, to protect consumers as well as the value and goodwill associated with the PopSockets Trademarks.

62.    PopSockets' quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor-quality products. Consumers would find it material and relevant to their purchasing decision to know whether a PopSockets product that they were considering buying was being sold by an Authorized Seller who is subject to PopSockets' quality control and customer service requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, PopSockets' quality controls and over whom PopSockets is unable to exercise its quality controls.

**Given the Flood of Poor-Quality Products Being Sold Online and Consumers' Inability to Inspect Such Products before Purchase, PopSockets Imposes Additional Requirements on Its Authorized Sellers Who Sell Online**

63.    PopSockets products sold online are more susceptible to quality and authenticity problems as consumers cannot see the product before they buy it.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.

64.    Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, PopSockets imposes additional quality control requirements on all of its Authorized Sellers who sell PopSockets products online.

65.    If an Authorized Seller is approved to sell online (thus becoming an "Authorized Online Seller"), the Authorized Online Seller may sell PopSockets products online only if it complies with additional quality control requirements.

66.    The PopSockets Rules allow Authorized Online Sellers to sell PopSockets products only through "Permissible Websites" and "Authorized Websites."  These rules allow PopSockets to oversee all Authorized Online Sellers who sell PopSockets products online.

67.    A "Permissible Website" is a website that: (1) is operated by an Authorized Online Seller in the Authorized Online Seller's own legal name or registered fictitious name; and (2) lists the Authorized Online Seller's mailing address, telephone number, and email address.

68.    Authorized Online Sellers must receive prior written approval from PopSockets before they can sell PopSockets products on any other website.  To obtain this approval, Authorized Online Sellers must submit applications and undergo substantial vetting by PopSockets that includes review of an applicant's business operating record and online review history.  A website that PopSockets permits an Authorized Online Seller to use through this process is called an "Authorized Website."

69.    The PopSockets Rules impose numerous additional requirements on Authorized Online Sellers who sell PopSockets products on Permissible Websites or Authorized Websites.

70.    For example, Authorized Online Sellers must use images of PopSockets products provided or approved by PopSockets and keep product descriptions up to date.  Authorized Online Sellers are also prohibited from advertising any PopSockets product they do not carry in inventory.

71.    The PopSockets Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by PopSockets or another third party.  These requirements allow consumers of PopSockets products to understand the nature of the seller from whom they are purchasing and contact the seller if any quality issues arise.  These requirements also allow PopSockets to protect the public from the sale of poor-quality PopSockets products because it allows for easy detection of an Authorized Online

Seller that sells poor-quality goods.

72.    At PopSockets' request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Website or Authorized Website where Authorized Online Resellers are selling PopSockets products.

73.    Authorized Online Sellers are prohibited from representing or advertising any PopSockets product as "new" that has been returned, repackaged, or otherwise been altered by a customer.  When customers return products that were purchased online, many websites and online marketplaces will, by default, repackage the products and allow them to be relisted as "new."  The PopSockets Rules prohibit Authorized Online Sellers from allowing or carrying out this practice to ensure that customers receive the high-quality PopSockets products they expect when they purchase "new" products.

74.    If Authorized Online Sellers use any third-party fulfillment service to store inventory or fulfill orders for PopSockets products, they must ensure that the fulfillment service provider is aware of and complies with all product quality controls and customer services standards required by the PopSockets Rules.  Authorized Online Sellers are also prohibited from using any fulfillment or storage service that could cause or allow customers to receive PopSockets products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet PopSockets' quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of PopSockets' quality controls.

75.    All websites through which Authorized Online Sellers sell PopSockets products must comply with all applicable data security, accessibility, and privacy requirements.

76.    All websites where Authorized Online Sellers sell PopSockets products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and their responses; (ii) provide this information to PopSockets upon request; and

(iii) cooperate with PopSockets in investigating negative online reviews related to sales of PopSockets products.

77.    The additional quality control requirements that PopSockets imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow PopSockets to carefully control the quality of PopSockets products that are sold online and quickly address any quality issues that arise.

78.    PopSockets' additional quality controls are also material, as they have been implemented to ensure that consumers purchasing PopSockets products online receive genuine, high-quality PopSockets products that abide by PopSockets' quality controls. Consumers purchasing PopSockets products online would find it relevant to their purchasing decision to know whether the product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, PopSockets' quality controls.

**PopSockets Monitors and Audits Its Authorized Online Sellers
to Ensure They Comply with Its Quality Control Requirements**

79.    PopSockets regularly audits its Authorized Online Sellers and monitors Permissible Websites and Authorized Websites to ensure that Authorized Online Sellers are adhering to PopSockets' quality control requirements. PopSockets carries out its auditing and monitoring actions pursuant to an internal program called the PopSockets Shoes, LLC Online Quality Control Program ("Auditing Program").

80.    As part of its Auditing Program, PopSockets examines a rotating sample of Authorized Websites and Permissible Websites each month to ensure that the Authorized Online Sellers who sell through the websites are complying with the PopSockets Rules. During these examinations, PopSockets checks to make sure that, among other requirements, Permissible Websites and Authorized Websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by PopSockets or a third party; (iii) do not display any content that could be detrimental to the PopSockets brand; (iv) do not make any

representations regarding PopSockets products that are misleading; (v) exclusively contain images of PopSockets products and product descriptions that are supplied or authorized by PopSockets and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

81.     PopSockets also periodically inspects online reviews of PopSockets products and Authorized Online Sellers that appear on Permissible Websites and Authorized Websites.  If PopSockets discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor-quality PopSockets products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, PopSockets communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

82.     Each month, PopSockets also conducts a test purchase of a PopSockets product from a rotating sample of Permissible Websites and Authorized Websites.  If PopSockets discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Permissible Websites and Authorized Websites—for example, by altering product packaging or fulfilling product orders in a way that allows customers to receive PopSockets products from other sellers' product stock—PopSockets communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

83.     Through its Auditing Program, PopSockets may visit the facilities of its Authorized Online Sellers to confirm that all of its quality control requirements are being followed and that Authorized Online Sellers are not selling any counterfeit, used, or otherwise poor quality PopSockets products.

84.     If PopSockets discovers that an Authorized Online Seller is selling PopSockets products of poor-quality or otherwise not adhering to PopSockets' quality control or customer service requirements, PopSockets conducts an investigation to determine the source of the problem.  The PopSockets Rules require that Authorized Online Sellers cooperate with

PopSockets' investigation, permit PopSockets to inspect their facilities and records relating to PopSockets products, and disclose all information about where they obtained PopSockets products. Based on what its investigation reveals, PopSockets has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of PopSockets products.

**Genuine PopSockets Products Come with PopSockets' Satisfaction Guarantee; Defendants' Products Do Not**

85.     PopSockets products purchased from PopSockets or PopSockets' Authorized Sellers come with the PopSockets Satisfaction Guarantee (the "PopSockets Guarantee").

86.     The PopSockets Guarantee provides that customers who are dissatisfied with a PopSockets product may request a refund or credit within 45 days of the date of purchase if the customer provides proof of purchase from a PopSockets Authorized Seller.  The complete PopSockets Guarantee statement can be viewed on the PopSockets website—see https://www.PopSockets.com/us/faq.html—and is incorporated herein.

87.     As discussed above, PopSockets cannot ensure the quality of the products sold by unauthorized sellers, like Defendants, who are not subject to PopSockets' quality controls.  For this reason, the PopSockets Guarantee does not cover PopSockets products sold by unauthorized sellers, like Defendants, who do not comply with PopSockets' quality controls and standards.  Indeed, the PopSockets Guarantee specifically states: "Please note that we are unable to control the quality of PopSockets products sold by unauthorized sellers Therefore unless otherwise prohibited by law, the Guarantee is not available for products purchased from unauthorized sellers, including unauthorized internet sites."

88.     The PopSockets Guarantee is a material component of genuine PopSockets products.  Consumers who purchase PopSockets products with the PopSockets Guarantee receive the peace of mind that they are receiving a good quality product, that PopSockets stands behind the product, and that if for any reason they are not satisfied with a PopSockets product, they will have the ability to request a refund or credit.

89.     Consumers would find it material and relevant to their purchasing decision to know whether a PopSockets product they were considering buying was covered by the PopSockets Guarantee.  If a consumer knew a product did not come with the PopSockets Guarantee, the consumer would be less likely to purchase the product.

### Defendants Are Not Authorized Sellers and Are Illegally Selling
### Non-Genuine Products Bearing the PopSockets Trademarks

90.     Due to the risks to consumers and the reputational concerns associated with the illegal sale of products bearing the PopSockets Trademarks by unauthorized Internet sellers, PopSockets actively monitors the sale of its products online.

91.     In the course of this monitoring, PopSockets discovered products bearing the PopSockets Trademarks being illegally sold by Defendants through the Unauthorized Storefronts.

92.     Particularly troubling is the sheer volume of PopSockets products being sold through these storefronts.

93.     After PopSockets discovered products bearing the PopSockets Trademarks being illegally sold on the Unauthorized Storefronts, PopSockets investigated the storefront to determine who was operating the storefront.

94.     PopSockets has spent significant time and money investigating the Unauthorized Storefronts.  It was through this investigation that PopSockets learned the identities of the Defendants in this case and it was through this investigation that PopSockets was able to locate the defendants.

95.     On or about September 12, 2024, counsel for PopSockets sent a cease-and-desist letter to Defendants demanding that they stop selling products bearing the PopSockets Trademarks.

96.     This letter also notified Defendants that PopSockets has contracts with its Authorized Sellers that prohibit Authorized Sellers from selling PopSockets products to unauthorized resellers, and that Defendants will be liable for tortiously interfering with those contracts if they continue to purchase products bearing PopSockets' Trademarks from Authorized Sellers for the purpose of reselling them.

97.     Defendants did not respond to this letter and continued to sell products bearing the PopSockets Trademarks.

98.     Defendants' disregard of PopSockets' cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants Are Infringing the PopSockets Trademarks by Selling Products Bearing the PopSockets Trademarks that Do Not Come with the PopSockets Guarantee**

99.     As set forth above, genuine PopSockets products purchased from PopSockets or Authorized Sellers who comply with PopSockets' quality controls come with the PopSockets Guarantee.

100.    Because Defendants are not Authorized Sellers of PopSockets products and do not comply with PopSockets' quality controls, the products they sell bearing the PopSockets Trademarks do not come with the PopSockets Guarantee.

101.    Because the products Defendants sell do not come with the PopSockets Guarantee, they are materially different from genuine PopSockets products.  The PopSockets Guarantee is a material part of what consumers expect when they purchase PopSockets products.

102.    Defendants' unauthorized sale of non-genuine products bearing the PopSockets Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine PopSockets products that come with the PopSockets Guarantee when, in fact, they are not.

**PopSockets Has Suffered Substantial Harm as a Result of Defendants' Conduct**

103.    As set forth above, the unauthorized sale of products bearing the PopSockets Trademarks through unauthorized sellers such as Defendants has caused significant harm to the PopSockets brand.

104.    When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with PopSockets.  As such, Defendants' ongoing sale of non-genuine products bearing the PopSockets

Trademarks harms the PopSockets brand.

105.    PopSockets has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

106.    PopSockets has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

107.    PopSockets is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the PopSockets Trademarks, causing continued irreparable harm to PopSockets' reputation, goodwill, relationships, intellectual property, and brand integrity.

108.    Furthermore, Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

109.    Defendants' disregard of communications from PopSockets and continuation of selling of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

110.    Defendants' willful violations of the PopSockets Trademarks and continued pattern of misconduct demonstrate intent to harm PopSockets.

### FIRST CAUSE OF ACTION
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**
**(Against Defendants)**

111.    PopSockets hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

112.    PopSockets is the owner of the PopSockets Trademarks.

113.    PopSockets has registered the PopSockets Trademarks with the United States Patent and Trademark Office.

114.    The PopSockets Trademarks are valid and subsisting trademarks in full force and

effect.

115.     Defendants willfully and knowingly used, and continue to use, the PopSockets Trademarks in interstate commerce for purposes of selling non-genuine products bearing the PopSockets Trademarks on the Internet without PopSockets' consent.

116.     The products Defendants sell bearing the PopSockets Trademarks are not authorized for sale by PopSockets.

117.     The products Defendants sell bearing the PopSockets Trademarks are materially different from genuine PopSockets products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that PopSockets has established.

118.     The products Defendants sell bearing the PopSockets Trademarks are also materially different from genuine PopSockets products because they do not come with the PopSockets Guarantee, which accompanies genuine PopSockets products.

119.     Defendants' unauthorized sale of materially different products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine PopSockets products when they are not.

120.     Defendants' unauthorized sale of materially different products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with PopSockets when, in fact, they are not.

121.     Defendants' unauthorized use of the PopSockets Trademarks has infringed upon and materially damaged the value of the PopSockets Trademarks and caused significant damage to PopSockets' business relationships.

122.     As a proximate result of Defendants' actions, PopSockets has suffered, and will continue to suffer, immediate and irreparable harm.  PopSockets has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

123.    PopSockets is entitled to recover its damages caused by Defendants' infringement of the PopSockets Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

124.    PopSockets is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, PopSockets will suffer irreparable harm.

125.    PopSockets is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the PopSockets Trademarks.

**SECOND CAUSE OF ACTION**
**Unfair Competition**
**15 U.S.C. § 1125(a)**
**(Against Defendants)**

126.    PopSockets hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

127.    As set forth above, Defendants are selling non-genuine products bearing the PopSockets Trademarks that are materially different from genuine PopSockets products.

128.    Defendants' sale of non-genuine products bearing the PopSockets Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by PopSockets when they are not.

129.    Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

130.    PopSockets is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, PopSockets will suffer irreparable harm.

131.    PopSockets is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on

the PopSockets Trademarks.

### THIRD CAUSE OF ACTION
**Common Law Unfair Competition**
**(Against Defendants)**

132.    PopSockets hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

133.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the PopSockets Trademarks interferes with PopSockets' quality controls and its ability to exercise quality control over products bearing the PopSockets Trademarks.

134.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are covered by the PopSockets Guarantee and are subject to, and abide by, PopSockets' quality controls when, in fact, they are not.

135.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are genuine PopSockets products when, in fact, they are not.

136.    Defendants' unauthorized advertisement and sale of non-genuine products bearing the PopSockets Trademarks is likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the PopSockets Trademarks suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with PopSockets when, in fact, they are not.

137.    Defendants' unlawful actions constitute active misrepresentation as to the source of the products they sell.  These false representations tend to confuse customers and induce them to believe that Defendants' products are genuine PopSockets products when, in fact, they are not.

138.    Defendants' unauthorized sale of products bearing the PopSockets Trademarks and

unauthorized use of the PopSockets Trademarks in advertising infringes the PopSockets Trademarks and constitutes unfair competition at common law.

139.    Defendants' unauthorized use of the PopSockets Trademarks has materially damaged the value of the PopSockets Trademarks, caused significant damage to PopSockets' business relations, and infringed the PopSockets Trademarks.

140.    As a result, PopSockets has suffered, and continues to suffer, immediate and irreparable harm.  PopSockets has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

141.    PopSockets is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, PopSockets prays for relief and judgment as follows:

A.    Judgment in favor of PopSockets and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B.    Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

        i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the PopSockets Trademarks;

        ii)    Prohibiting the Enjoined Parties from using any of the PopSockets Trademarks in any manner, including advertising on the Internet;

        iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising,

promoting, or displaying any and all products bearing any of the PopSockets Trademarks;

iv)  Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the PopSockets Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)  Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of PopSockets' products, or any of the PopSockets Trademarks;

vi)  Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the PopSockets Trademarks which associate PopSockets' products or the PopSockets Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)  Requiring the Enjoined Parties to take all action to remove the PopSockets Trademarks from the Internet, including, but not limited to, third-party marketplace websites such as www.amazon.com, www.walmart.com, www.ebay.com, and www.target.com; and

viii)  Requiring the Enjoined Parties to take all action to remove, or cause to be removed, any customer reviews of products bearing PopSockets' trademarks that were sold by Defendants on third-party marketplace websites including, but not limited to, www.amazon.com and www.ebay.com.

C.      An award of attorneys' fees, costs, and expenses;

D.      Such other and further relief as the Court deems just, equitable, and proper.


### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, PopSockets demands a trial by jury on all issues so triable.


Dated: November 22, 2024

_s/ John G. Connolly_
John G. Connolly
Connolly Finkel & Gosselin LLP
15760 Ventura Boulevard, 18th Floor
Encino, CA 91436
Telephone: (213) 452-6500
E-mail: jconnolly@cfgllp.com
_Attorneys for Plaintiff PopSockets, LLC_